States. Counsel for appellant, please approach and proceed. Thank you, your honors, for the opportunity. I'd like to reserve five minutes of my time at the end for rebuttal. Counsel, please be reminded that the time shown on the clock is your total time remaining. Where do I see the clock? Right there. It's right in front. Thank you. And I'd like to introduce to you the Board of Elders and the members of the Society, if they would stand up, please. And they have come here from Kansas, from Hawaii, from other parts of the country. They're very interested in this case because this is their society. Bishop Elizabeth Gardner and her husband, Rick, are here also. But this case is the society as appellant. All right. Thank you, Counsel. How did this case start? The IRS assigned a revenue officer, Jeanette Vega, Tucson, Arizona, 180 miles from the property in question here, to collect. She had an open docket for collection of Gardner's old tax liabilities. She never went to the property, knocked on the door, or entered the premises. She was untrained in church-related information, non-profit organizations. She's just a collector. What she saw, and she had never heard of a corporation sold, albeit most of us have never heard of a corporation sold, but it's been around since merry old England, 1400, when churches could not own property. They created an archbishop to own the property so that it — and 16 States have codified this. The common law carries it forward. It is — Is corporate sold, then, a religious term that's only applied to — In Arizona, you don't have to be a church in order to be a corporation sold. It's one of the few States that does it. This is a church organization. Most of the States are church organizations. The one thing — one other technical question I have. Can you describe what the difference is between a corporate sold and a nominee? Yeah. And we're going to get to the two factors. And we went every one of them when it's in the factors in the light of the non-moving party. If you take our facts, the church, the predecessor to the corporation sold, the Messiah's remnant — Very much like what a nominee is, right? No. It could. And the controlling case — and thank you for the question. The county of San Luis Obispo hit this case on the head, very similar circumstances. And I cite this in the brief, and I want to bring your attention to it, because the case there said, is whether the assets of a corporation sold are the personal assets of its titular head — in our case, Elizabeth Gardner — and thus subject to execution for his or her debts. The answer on the basis of legal authorities defining the corporation sold and its attributes must be, as the trial court concluded, an unequivocal no. That's the county of San Luis Obispo versus Amherst. Okay. Huge case in our favor. And I beseech all of you to pay rapt attention to that, because a corporation sold is not the same as an individual pastor or minister who may have a debt. And that's the case of San Luis Obispo. Thank you for the question. Well, counsel, you know, we're here on summary judgment, correct? Beg your pardon? We're here on summary judgment. And so one of the issues is whether there are any tribal issues of fact as to the nominee's status. And, you know, and we've got the property, and then we have, you know, the bank account as well. The bank account is going to be a no-brainer. They're wrong. We're right. And I'll get to the — Well, let me — let me get to my question first. Certainly. At one point in the title chain, it was — the property was owned — Apache Knolls, I believe — it was a — it was owned in the name of Elizabeth and her husband, at one point in time in its ownership history that occurred. Does that defeat your argument? I want to address that. Yeah, I want to address that emphatically. Because what happened was, 10 years after the property was built, it has always been titled in the name of a church. And then the roof started leaking. They needed a roof repair. They couldn't borrow money in the name of the society. And what they found was banks lend to individuals. And just like in my practice, I do estate planning. I do revocable living trust for people. But when they have to refinance, they — the bank says, put it in the individual's name. You can put it back in your — the trust name afterwards. Same thing happened here. They took the property out of the church name, Messiah's Remnant, put it in the gardener's name. There was no federal tax lien at the time at all. So it went out to the gardeners, got the loan, went back into the church name. That's historic. And just like my estate planning clients that take it out of the revocable trust, put it back in, it's to accommodate banking situations. It had nothing to do with anything other than how do you get a church that's not recognized, doesn't have a credit score, can't get money. It's very important for it to be able to — So is there — is there a distinction in your mind between a corporate soul and a nominee? This is following up on Judge Bumate's question. Absolutely, because a nominee implies that the gardeners, in this case, had something to give to the church, that this property was acquired in the church name, Messiah's Remnant, with church funds that existed years ago. It stayed in that name until the refinancing of the roof in about 2013 or 16, which I don't remember. But anyway, then it went back in. And in 2019, it was titled in the Society of Apostolic Ministries, or Christian Church Ministries. And so it's very different, because if we look at the tow factors and we realize that — Counsel, can you explain the other two transfers that are not to the gardeners? Why were those legitimate transfers? Certainly. Church has funds, donations. Those funds don't go to Mr. and Mrs. Gardner. They go to the church. And as such, they're there for ecclesiastical, ministerial, pastoral reasons. Okay? And so the fact that a revenue officer says, ah, looks like Elizabeth Gardner's name's on here as the titular head of this corporation, so I'm going to blow right past that. That's what a revenue officer does, pressures people. Okay? That is what happens. So I believe it was bought by Bethel Amherst Ministries first, correct? And then it was transferred to Church Restoration Ministries. Please understand, those are just name changes of the same organization. And then — So essentially, that transfer had no effect whatsoever? Right, right. It's just for one church. It's just a name change. But then the — when it went from that church over to the society, and the society is made up of over 100 different members with a board of elders controlling, but by statute, it has a titular head, Elizabeth Gardner. Did the society pay any money for that transfer of the property to it? It did not have to, because it's, again, from one exempt organization to the other. Well, but that's the first — No. Okay. That's the first two-factor. Yeah. So why don't you run through them? But it has to be in the Gardner's first. Can you let me finish my question before you answer? Yes, sir. Why don't you go through the two-factors? The first one is about no consideration, and the government presents undisputed evidence that there was no consideration paid for for the transfer of the property to the society. So tell me why you think the two-factors side in your favor. You have to take the facts in light of the facts most favorable to the nonmoving party. That's the society. The society is a pellet. The society received it from another church organization, okay? It — when one church decides to roll into another church or give to another church, there is no reason for a transfer. As a matter of fact, when we look at tax-exempt organizations, they're obligated at the end of their days to leave their assets to another non-tax-exempt organization. So the transfer from the first church to the society need not have any consideration. And because it wasn't — What about the factor of the close relationship between Ms. Gardner and — Again, I — please pay rapt attention to the county of San Luis Obispo. It guides us there. It tells you you cannot take the debts of the minister, the pastor, and throw them up against the wall. I've got 30 seconds more before my reserve time, but I'm going to tell you that nothing in the arguments that the district court did was in light favorable to the nonmoving party. If we look at the facts in favor of the nonmoving party, the Gardners, other than this roof repair, didn't ever have title. And it was only an accommodation because of banking. And in my practice, that's reality.  And the funds — Can I ask you about the society paying for the Gardners' expenses? I think it's utilities and — A valid property. It seems like a lot. So, you know, I guess if you agree that there's a distinction between a nominee status and a corporate soul, I guess the government's position is, well, they seem almost one and the same. You know, the society is paying for all the expenses of the Gardners. It owns title and the deed, but there's been no consideration paid for it. There's really — it's really that the ownership is actually the Gardners and not the societies. Nothing could be further from the truth. There's a $50,000 contribution from a pastor in Oregon, and they argue, oh, he gave that for services rendered because the Gardners were really nice to him. Well, ministers know one thing. When they make a donation to somebody else, they give it in the church name. It never came to the Gardners. It wasn't the Gardners' money or property. That money should be sacrosanct in the church. And I reserve the rest of the time. Thank you, counsel. And I've got four minutes and four seconds. Exactly. Good morning, Your Honors. Douglas Rennie for the United States. Your Honors, the question in this case is who this money and property really belongs to. Now, the society may be holding it, but if, in reality, it belongs to the Gardners, then their creditors, including the U.S. government, can get to it. Summary judgment was proper here on the society's claims for wrongful levy and dequired title because the undisputed fact shows that the Gardners did not own the property. The Gardners are exercising active or substantial control over this property. Some of those key facts. We just heard about Elizabeth Gardner supposedly being the titular head of the society. Counsel, before you get there, can you describe the government's position on what the difference is between corporate souls and nominees? Are they the same thing in government's view? No, Your Honor. A corporation soul is like any other form of entity. It's fine in theory. It can be abused in a nominee manner just like any other form can be. And in this case, we would submit that the facts show that it is, in fact, being used as the Gardners' own, to hold the Gardners' own money and property. And how do we know that? Look at what Elizabeth Gardner testified. Before you get into that, just for a moment, and there are nonreligious uses of the corporation soul function as well? I'm not sure about that, Your Honor, and it may vary by state. But any person or entity could theoretically be a nominee. You know, my brother could be my nominee. If I'm in debt, I could give my money and property to him. It doesn't mean he's an illegitimate person, but it would necessarily mean that that specific money or property he's holding doesn't belong to him. I'm really the beneficial owner. So that could be the case with a closely held corporation. It could be the case with a partnership, a trust, just about any entity you can imagine. Okay. You were going to talk about the facts. Sure. Elizabeth Gardner was asked, do you sit at the top of the organization? She said, yes, I am the head. I am the bishop. She mentioned that there's a board of elders that counselor with her, but she has authority over everything. But that I don't understand. How does that count against them? I mean, that happens in any religion. Not necessarily, Your Honor. She said the board of elders here counsel with her, but they do not advise her on financial matters, she specifically said. So that happens in many religions. It may be the case, but look, this is one of several factors that show they're really exercising active and substantial control over the property. I guess to me, bottom line is the government's argument is that it's not a legitimate religion, and then therefore all these facts that could be either that he's a nominee or that it's a religion should be construed in light of the fact that she's the nominee. No, it could still be a legitimate religion. That's not what this case is about. This case is just about who really owns the property. The fact that she's the head of her church and makes financial decisions, that seems unremarkable in many other religions. It's one of the factors. She's making all the decisions here. It goes through factor three of the tow factors of the fourth investment case. Other issues, they're living in the property continuously for 25 years across different entities. When the church owns it, they own it. Again, that seems unremarkable for other religions. I mean, a pastor could live in a church-owned house while he's a pastor. That could happen, sure. But again, look at the situation here. Here we've got individuals who have existing debt who are showing that they're using this property for themselves, doing whatever they want with it. Right. So that's the — I guess there's a problem. Like, in one respect, in one light, you could look at it in the governance view, and this — it makes them a nominee. In another respect, it's just, you know, a pastor living in the house of a church. So under the summary judgment standard, don't we have to credit that view? No, Your Honor. Look at the facts of the case. Okay. Go — what's the fact that's going to prove that it's not a religious entity that just — under a normal religious entity that, you know, that provides a house to their pastor? It could still be a religious entity. In this discussion about, you know, whether they're allowed to provide parsonage, that — this is more relevant to if they owed taxes on that imputed income to them in the current taxable year. The question here is, is this property really theirs? Right. Is the money — is the real property really theirs? How did they acquire this property? It was Bethel Aram Ministries, which has subsequently been held to be their alter ego by the District of Arizona and this Court, which was paid for with money that this Court has already said were really money paid to them. Do we take those facts in this summary judgment posture? Of course. Is that right? Okay. Yeah. I mean, that was an appeal from a tax court judgment, right? The deficiency case was, yeah. And so — and that standard is substantial evidence, so that's what the Ninth Circuit was upholding. I don't believe it's a substantial evidence standard, Your Honor. A deficiency case is — Okay. Yeah. But I guess my — here it's in the light most favorable to the nonmoving party, so — That's the summary judgment standard, yes, Your Honor. Yeah. Some of the other factors, there's no evidence that anyone else has interfered with their use of the property, that anyone else has benefited from the property. The money is going to pay all of their expenses. I thought there was some argument they used that property for, like, the Zoom masses or — Or a congregation. Yeah. For — yes, for some — So that was on that property? I believe so, Your Honor. That's what they said. So that's some evidence of sure that they use it outside of the personal use? A small benefit, but there's no money — Again, but then the summary judgment standard, is that enough to, like, show that they're using it for the church? I don't think so, Your Honor, because, again, all the money is going to them. They're the ones who live at the property, are maintaining it exactly as they choose. All of the expenses are being paid as they decide. So, again, we would submit that the facts here strongly support summary judgment. And this is — you know, these are the facts that they testified to in their deposition. This is what they said in their affidavits on summary judgment. These aren't really contested facts. I agree, but it just seems like — I don't see what the distinction between these facts and the facts of a small church that allows their pastor to live in the house while that pastor is the pastor. And maybe that pastor doesn't have to pay taxes on the — whatever benefit he's getting from living in that house. And maybe they don't, either. But that's not really relevant to whether the property really belongs to them, and it's something their creditors can get to. So, like, if the Catholic pastor, you know, in a small church, lives in the house owned by the Catholic church, and he lives there the entire time he's the pastor, the IRS can then claim that that house is the pastor's and not the church's? Not just because of that. Okay. But it — I mean, it might be relevant as one fact going to that, but in and of itself, no, that's not going to be enough to make that — What would make that — what other fact do you need, then? You need the fact that they basically purchased the property with money that they earned from non-ministerial services, that they've been living there continuously, uninterrupted for 25 years, that they're using all the church's money to pay their own expenses as they decide in whatever capacity they want. That they're — you know, when it suits them — One of the — one of the points in the record, I think, was that there was a payment made to a brother? Is that — from the account? Did I get that correctly? There was a payment made, I believe it was from the church's account, although originally the money that they claim it came from went into the society's account. So I believe what Elizabeth Gardner has said is that the — she inherited money from Frederick Gardner's family, about $15,000. Some time passed, and she decided to give — she put that money into the society's account. Some time passed, and then she decided to give some $7,000 or so to Frederick Gardner's brother. And was that for church purposes or personal purposes? Does the record —  Personal purposes. And you can see that another factor here being the frequent conflation and use of the society's money for their property, depositing checks to the society into their personal accounts and vice versa, which they — So let me ask you this just to tag into Judge Bumate's questions. If a church is using this corporate form and is not turning into a nominee status, does a corporate soul have to segregate their own personal expenses and other things from things related to the church activities? And is that — I mean, what would be, in the government's view, the way that this would play out without a problem about nominee status? That would certainly help, yes, if you were — Like no commingling. Correct. Right. And if there were true procedures in terms of approving expenses and not simply Elizabeth Garner deciding —  What do you mean by that? Basically, she says she's making all the financial decisions. Well, doesn't that get into the church autonomy doctrine? You're then investigating how churches make decisions, right, within their church. Again, these are facts that go to the nominee status.  And that is relevant to any — It seems like the IRS is then saying that this church procedure for deciding how money is spent is not good enough. Your Honor, it's just one of many facts that go into this — But you are using that fact, though, right? How the church decides how to spend its money doesn't comply with how the IRS believes religion should spend their money. No, that's not how we would say it, Your Honor. We would say that they're deciding to spend the money on themselves in whatever manner they choose. No, but you were just saying that she — because the church allows Elizabeth Garner to decide how to spend the money herself, that that's improper. I'm not saying it's inherently improper. None of these one single facts is inherently improper. That's the problem, though. It's them taken together. You take every one of these single facts, there's a light most favorable to them, which shows that they're a true religion, or there's a light most favorable to the IRS, which is saying that this is a fraud. It's not a — Go ahead. Your Honor, it's not a light most favorable question because these are undisputed facts. Right. I mean, that's problematic to me, the fact that how the church spends its money is fraudulent to the IRS. That really gets into the church autonomy doctrine and whether or not we could be — the government's going to be deciding what's a proper way for church procedures to make decisions. It's not an allegation of fraud, Your Honor. This is simply a question of whether they really own the property, and this is evidence of that fact. But I — but the only reason why it's evidence is because you're saying churches would normally have a board of elders grouped together and make a decision together, and the fact that they're doing it singularly means that it's not a legitimate church in some respect. Again, not necessarily. Nobody's saying it is necessarily illegitimate because of one specific procedure. These — this is just evidence of the fact that it's not really the society's money. Before your time runs out, can you address counsel's reliance on the city of San Luis Obispo case? Why — can you speak about that case and why you don't think it helps their cause? Right. Again, inherently, it's correct. The church's money and the individual minister's money are going to be separate things. A church is not necessarily going to be on the hook for the minister's debts. The question we get here, though, is, is that money really the minister's? Is there evidence that this is really the minister's money? Is it going to the minister's benefit? And if that minister has preexisting debts, then the creditors can reach it. Here, that's the case. In that San Luis Obispo case, my understanding is that there — it wasn't a nominee analysis. They were not proceeding under that theory. And we didn't get into all of these facts. We didn't have the evidence we have here. All right. Can I ask one last question on the account? So that was a donation from Reddell Nelson, right, of an — is that correct? Some of it was, presumably. At some point. And are you saying that that was not a legitimate donation to the church? No, we're not saying it wasn't necessarily a legitimate donation. We're just saying it was, according to them, according to what they say, it was given to them to use for — to help someone in need or for themselves, so they could use it however they wanted. It went into the society's account, presumably. And we know at some point they did use it for some purpose. We don't know, to some degree, because their account went down to about $38,000 at — as of, I believe, 2016. Well, if we don't know, then how under a summary judgment standard can we say that it's definitely theirs? Sorry, Your Honor? If you don't know how it was spent, how can you say under a summary judgment standard that it was definitely — that they used it for themselves personally and that it could be — that it's a nominee for them? Well, we know they used it. Yeah, but we don't know how, right? Fair enough. We don't know exactly what it was spent on, but — How can that meet the summary judgment standard? We look at all the facts, Your Honor. Yeah, that's all the facts for the account. What else is in the facts in the account? There is other money going into the account based on their corporation sole services. These are non-ministerial services that they're providing, tax preparation services. You've got to admit, though, that the $50,000 donation to the church that we don't know how it was used, and the light was favorable to them, we should say that that account — I mean, that should go to trial whether or not they're a nominee for that account. I don't think so, Your Honor. That was generally pooled with other money that the society was taking in that was mixed in with all this other money based on non-ministerial services. We don't know if it was spent or if it was not spent, and it was given to them to use as they wanted. Fair enough. All right. Thank you, counsel. Thank you, Your Honor. Rebuttal. Wow, you guys were on point, and thank you. We're not guys. We're not you guys. We're your honors. I'm sorry. Your honors, thank you for your kind attention, and this case screams out for the voices of those that will speak to the tow factors, to speak to the nominee, to speak to the church and the like most favorable to the church. And the other arguments that he has made again and again go to a jury. They're not for a summary judgment. And so this case, and he said — my worthy opponent said three times, these are undisputed facts. Well, in light most favorable to the taxpayer, I win the tow case. I look at my facts better than the San Luis Obispo case because that minister transferred something from himself to his corporation. So we did not ever, in our facts, ever transfer anything to that other than this roof repair, and that is excusable because banking required it. Counselor, can I ask, is there any evidence in the record of anyone else being in control of this bank account, of being able to direct its funds? The bank account that we're talking about was in the total control of the society. It was a credit union account. There were two accounts, a savings and a regular account. No, I know it's in the society's name. Elizabeth Gardner and then the society's secretary, who's here today, Joyce Essman, were both signers on the account. And so does being a signer on the account allow someone other than the Gardners to be able to transfer funds and make decisions about it? Absolutely. That's what — And where in the record is that? If you look at — if you focus on Joyce Essman, she's the administrator, the secretary. She's seated right over — Counselor, no one's testifying at an oral argument. You have to give me a record site for it.  If you look up Joyce Essman, we've cited it, and she has authority also. This case, again, the Yavapai County determined that this was a legitimate church tax exempt. They looked at it. They went inside. Is there anything in the record to indicate how this $50,000 transfer was dispersed or acted upon? It's through the affidavits, Your Honor. We don't have documentary evidence because it was so long ago. OK. I'd love to have documentary evidence. We don't. But believe me, this board of elders, everybody knew about this donation because it was paramount. It would have been used for one of these members whose house burnt down in Paradise, California, and was in dire need. But that occurred about a year after Ms. Vega took the money. But that's the kind of thing that this would have been used for, Your Honor. And, you know, and again, the questions from this honorable circuit — Ninth Circuit judges are right on point. The facts are disputed. They need to be read in the light favorable to the nonmoving party. We have plenty in the record. And if you go to the affidavits, if you go to the documents, this court totally blew it at the district court level because they did not take the tow factors in light favorable to the nonmoving party. They certainly did blow right past the church accounts that, again, our clients live on Social Security. They had a right to be supported under their vow of poverty. And so the little bit of money that came out — and again, we're talking tiny bits of money — could be used. And thank you for your time, and thank you very much. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: RAWLINSON, BUMATAY, SANCHEZ